KLIEBERT, Judge.
Sam T. Recatto, an employee of Bayou Maintenance, Inc., brought this tort action against Bayou Steel Corporation and its insurer, Home Indemnity Company, for personal injuries sustained while performing electrical work at Bayou Steel Corporation’s LaPlace facility pursuant to a contract between Bayou Maintenance and Bayou Steel. Defendants pled the affirmative defenses of victim fault, contributory negligence, and “statutory employer” and thereafter filed a motion for summary judgment alleging that Bayou Steel was the statutory employer of Recatto and accordingly Recat-to’s exclusive remedy against it was for compensation benefits. The trial court entered summary judgment in favor of the defendants, whereupon plaintiff perfected this devolutive appeal.[1] He asks this court to consider whether under the facts hereafter set forth summary judgment was proper. We affirm the judgment of the trial court.
FACTS
In support of their motion for summary judgment defendants referred the court to the pleadings, depositions and admissions on file, as well as affidavits attached to the motion. These exhibits reveal that Bayou Steel Corporation is engaged in the manufacture of structural steel products at its LaPlace facility. Scrap metal is melted in electric arc furnaces in the meltshop department and transported to the casting department, where it is cast in continuous strands which are cut into “billets” of varying lengths. Some of the billets are sold to other steel fabricators. Other billets are processed in the rolling mill and cut into structural shapes such as I-Beams. As with any large corporation, the organizational structure of Bayou Steel includes a Purchasing Manager, a Director of Human Resources, Sales and Finance Managers, and a General Manager of Operations. The maintenance department, which is under the supervision of the General Manager of Operations, is headed by a superintendent and includes a general foreman, line supervisors, and hourly employees. Among the hourly employees are approximately fifteen electricians, seven to nine of whom are assigned to the rolling mill. Their duties throughout the year are to maintain and repair the electrical equipment which is utilized in rolling and cutting billets. In July of each year general plant operations are suspended for approximately two weeks, during which time machinery and equipment may be inspected and necessary repairs and preventive maintenance effected. The purpose of the shutdown is to prevent downtime during the production year by insuring that the machinery is in prime operational condition. Because of the scope of the project all maintenance personnel, including electricians, participate. Nevertheless, on occasion Bayou Steel faces a manpower shortage during the shutdown and accordingly contracts with Bayou Maintenance Inc. for electricians. The manpower shortage may be due to the absence of employees, the volume of work to be done, or a combination of both. Contract electricians are infrequently utilized during normal plant operations. The contract electricians are assigned tasks by Bayou Steel supervisors and work side-by-side with Bayou Steel electricians. They are paid by Bayou Maintenance and possess no specialized trade skills beyond those possessed by Bayou Steel electricians.
During the summer of 1984 Bayou Steel contracted with Bayou Maintenance for two temporary electricians to assist during the annual shutdown. The electricians, Sam Recatto and Bob Thompson, assisted Bayou Steel electricians in repairing or replacing damaged cable trays, replacing electrical panels, and cleaning and inspecting equipment. Approximately three weeks after reporting to the Bayou Steel facility Recatto was injured while inspect *879 ing a resistor bank. His injuries were sustained when he tripped over a piece of angle iron and fell against air conditioning ductwork.
STATUTORY EMPLOYMENT DOCTRINE
The threshold issue on this appeal is whether Bayou Steel was the statutory employer of Recatto, as contemplated by LSA-R.S. 23:1061,[2] resulting in tort immunity for Bayou Steel under LSA-R.S. 23:1032. In memorandum submitted to the trial court and in briefs filed in this court the parties agree that the controlling law is as stated in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986); Rowe v. Northwestern National Ins. Co., 471 So.2d 226 (La.1985); and Lewis v. Exxon Corp., 441 So.2d 192 (La.1983). Not surprisingly, the parties reach opposite conclusions in applying the facts of the present case to the law set forth in the cited cases.
In Berry, supra, the court identified a developing shift in its interpretive analysis regarding the statutory employer defense from one which favored a liberal application of the doctrine to one which is more restrictive, and acknowledged that it had failed to succinctly set forth the method of analysis presently used by the court in resolving the question of statutory employment. The court thereafter enumerated the following guidelines at 488 So.2d 937-938:
“... Basically, a determination of whether a statutory employment relationship exists involves a three level analysis. In the first level, the primary focus is on the scope of the contract work. ‘The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered.’ Lewis, supra, citing Malone, Principal’s Liability for Workmen’s Compensation to Employees of Contractors, 10 La.L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized. This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal’s trade, business or occupation, and the principal is not the statutory employer of the specialized contractor’s employees. In this situation, ‘the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play’ because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility. Williams v. Shell Oil Co., 677 F.2d 506 (5th Cir.1982) (Tate, J. writing for the panel), citing 13 W. Malone & H. Johnson, La. Civil Law Treatise—Worker’s Compensation, §§ 78, 126 (1980).
If it is determined that the contract work is non-specialty then the inquiry shifts to a comparison of the principal’s trade, business or occupation and the contract work to see if the latter can be considered a part of the principal’s trade, business or occupation. The jurisprudence has forged several guidelines, in *880 no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson [v. Seagraves, 436 So.2d 525 (La.1983)], supra; Barnes, supra [v. Sun Oil Co., 362 So.2d 761 (La.1978)]; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen’s Compensation, § 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir.1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, § 126, pp. 252-53, fn. 91.
These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen’s Compensation for Occupational Injuries and Death, § 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of ‘whether [the contract work] is, in that business, normally carried on through employees rather than independent contractors.’ Id. (emphasis added)
Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level ‘[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury.’ Lewis, supra.”
APPLICATION OF LAW TO FACTS
In conducting a first level analysis we are guided by the trial court’s pronouncement in reasons for judgment that the facts clearly show the work being performed by the plaintiff was not specialized per se in that it did not involve skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. Indeed, the exhibits undisputedly showed that Bayou Steel electricians performed the same tasks as contract electricians, and the contract electricians were assigned tasks by Bayou Steel supervisors. Although contract electricians supplied their own basic tools, Bayou Steel equipment and tools were available if needed, and the materials used in making repairs were supplied by Bayou Steel. Further plaintiff admitted he possessed no special trade skills beyond those of the Bayou Steel electricians with whom he was assigned tasks.
Plaintiff’s counsel seeks to analogize the present case to Rowe, supra, wherein it was held that an electrician for an electrical contractor who was injured while repairing a pump at an agricultural company’s bulk liquid facility was not a statutory employee of the agricultural company. Rowe, however, is clearly distinguishable in that none of the agricultural company employees were electricians, none of the employees customarily performed electrical *881 work, and such work was customarily contracted out. In the present case, approximately eight electricians were assigned to the rolling mill. Their training was similar to that of the contract electricians, and they performed the same tasks. While specialized skills were a factor in the employment of the contract electricians, it was a shortage of manpower rather than a lack of technical knowledge which created a demand for their services. As the contract work in the present case was not specialized per se, we must consider the second level of analysis.
The trial court in reasons for judgment also enunciated its conclusion that the work being performed by plaintiff was routine, customary, regularly scheduled maintenance and repair work necessary to the smooth and continued production of fabricated steel. It is uncontroverted that the facility is shut down each summer in order that the type of work being performed by plaintiff might be effected. Plaintiff was not engaged in non-recurring or extraordinary constructions and/or repairs. Rather, he was repairing or replacing damaged cable trays, changing burned out electrical panels, and cleaning and inspecting resistor banks. Bayou Steel had the equipment and personnel to perform these tasks and did so as necessary throughout the year. It was only on occasion that contract electricians were hired to supplement the regular maintenance crew.
Plaintiffs counsel characterizes the changing of damaged cable trays as the installation of new equipment, similar in scope to the work performed by the plaintiff in Lems. In Lewis, the contract work was construction to convert an existing structure from the production of ethanol to the production of isopropanol. The Lewis court determined that it was not Exxon’s business practice to engage in the construction of that type and magnitude, nor did the record support a conclusion that Exxon customarily performed that type of work. In the present case the record clearly shows that Bayou Steel electricians customarily repaired or replaced damaged cable trays. Thus, we decline to characterize such activity as either “new construction” or “major modifications.” While it is true Bayou Steel occasionally made major modifications in the production unit during summer shutdowns, no such modifications were effected in the rolling mill during the period in which the plaintiff was under contract. As the record clearly shows that the contract work was a part of Bayou Steel’s trade, business or occupation, we must now consider the third and final guideline.
Although the production lines were closed at the time of the accident, Bayou Steel was nonetheless engaged in its trade, business or occupation. The importance of the shutdown as regards the facilitation of uninterrupted steel production during the rest of the year was illuminated throughout the deposition testimony. In the absence of repairs and preventive maintenance to the rolling mill equipment, Bayou Steel would be unable to produce structural steel products. The relationship between actual production and preventive maintenance cannot, under the facts of the present case, be severed. Accordingly, we conclude, as did the trial judge, that Bayou Steel was actively engaged in its trade, business or occupation at the time of the accident.
For the foregoing reasons, we affirm the judgment of the trial court in all respects. All costs of this appeal are to be borne by the appellant.
AFFIRMED.

. Aetna Casualty and Surety Company filed a petition of intervention seeking recovery of weekly compensation benefits and medical expenses which it paid on behalf of Recatto pursuant to a contract of insurance between Aetna and Bayou Maintenance’s parent company, Payne & Keller, Inc. The intervention was not addressed in the summary judgment and is not before this court.

. LSA-R.S. 23:1061 provides, inter alia:
“Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed."